future of publishing would be presented in May 2004. *Id*.

84. Carmine Branagan was the only person involved in recruiting and making the decision to hire a Publisher for ACC. See Affidavit of Carmine Branagan, paragraph 35.

85. John Gourlay was the only person that Carmine Branagan recruited and interviewed for the Publisher position. *Id*. at par. 37; and See Exhibit "K", p. 201.

86. John Gourlay was the only person that Carmine Branagan offered the Publisher position to. See Affidavit of Carmine Branagan, paragraph 38.

87. Carmine Branagan did not conduct a search for other candidates for the Publisher position because she felt that John Gourlay was the right person for the job. See Exhibit "K", p. 201.

88. Carmine Branagan determined that John Gourlay was the right person for the Publisher position based on Mr. Gourlay's Publisher experience contained on his resume. See Exhibit "D"; and See Exhibit "K", p. 201-202.

89. Carmine Branagan also determined that John Gourlay was the right person for the Publisher position based on her prior experience working with Mr. Gourlay on the National Audubon Society's magazine. See Exhibit "K", p. 202.

90. Michael McKay was not involved in the decision to terminate Donald Zanone. See Exhibit "M", p. 146.

91. Lois Moran did not make the decision to recruit and hire the Publisher, John Gourlay, and she did not make the decision to terminate Mr. Zanone's employment. See Exhibit "L", p. 175-176.

92. On April 28, 2004, plaintiff's employment was terminated and his position of Advertising Manger was eliminated. See Exhibit "A", Complaint, par. 6; and Affidavit of

Carmine Branagan, paragraph 23.

93. Plaintiff's supervisor, Lois Moran, never asked Carmine Branagan to retain Mr. Zanone's employment. See Exhibit "K", p. 178.

94. Plaintiff's supervisor, Lois Moran, never told Carmine Branagan that Mr. Zanone might be capable of being the Publisher. See Exhibit "L", p. 171.

95. Plaintiff's supervisor, Lois Moran, never saw interest or performance by plaintiff in circulation or newsstand sales. See Exhibit "L", p. 174.

96. Plaintiff's supervisor, Lois Moran, never recommended to Carmine Branagan that Mr. Zanone be considered for the Publisher position. See Exhibit "K", p. 178.

97. Plaintiff does not know who made the decision to terminate his employment. See Exhibit "J", p. 88-89.

100. Plaintiff does not know when ACC made the decision to terminate his employment. *Id*.

101. Mr. Zanone does not know when ACC first considered hiring a Publisher or who ACC considered for the Publisher position. See Exhibit "J", p. 94-95.

102. Mr. Zanone does not know when ACC first started communicating with John Gourlay. *Id*.

103. Mr. Zanone was not involved in the decision to hire a Publisher for ACC. *Id*.

104. ACC's hiring of a Publisher affected Lois Moran's job title and responsibilities. See Exhibit "L", p. 150. Before April 2004, Lois Moran held the position of Editor and Publisher. See Exhibit "L", p. 24-25 and 157; and See Exhibit "J", p. 21.

105. Lois Moran's job description, dated May 22, 2001, states that, as the Editor and Publisher, she was responsible for hiring and supervising the advertising staff and for working

with consultants on circulation and direct marketing efforts. See Exhibit "R", first page.

106. After April 30, 2004, Lois Moran's job title changed from Editor and Publisher to Editor in Chief. See Exhibit "L", p. 24-5 & 157.

107. After April 30, 2004, Lois Moran's job responsibilities changed in that she no longer performed the publishing work involving circulation and dealing with publishing related consultants. See Exhibit "R", second page; and See Exhibit "L", p. 25 & 150.

108. After April 30, 2004, Lois Moran no longer supervised advertising sales. See Exhibit "L", p. 150; and See Exhibit "R", second page.

109. Lois Moran's job description, dated May 17, 2005, reflects that, as the Editor in Chief, she is no longer responsible for hiring and supervising the advertising staff and for working with consultant on circulation and direct marketing efforts. See Exhibit "R", second page.

110. After April 30, 2004, Michael McKay's job responsibilities changed in that the Publisher assumed his publishing duties. See Exhibit "M", p. 10-12.

111. John Gourlay, as Publisher, holds direct responsibility for management, development and implementation of business plans and budgets for all aspects membership/circulation, advertising sales, newsstand distribution/sales and list rental. See Affidavit of Carmine Branagan, paragraph 47.

112. On April 30, 2004, John Gourlay began his employment with ACC as a Publisher. See Affidavit of Carmine Branagan, paragraph 41.

113. John Gourlay was born on February 15, 1954 and was 50 years of age when hired by ACC. See Affidavit of Carmine Branagan, paragraph 43.

114. In April 2004, John Gourlay's starting base salary was $88,000. See Affidavit of Carmine Branagan, paragraph 44.

115. In April 2004, Donald Zanone's base salary was $58,000. See Affidavit of Carmine Branagan, paragraph 45.

116. John Gourlay, as Publisher, reports directly to the Executive Director, Carmine Branagan. See Exhibit "K", p. 88.

117. Donald Zanone never reported to the Executive Director. Mr. Zanone reported to the Editor and Publisher, Lois Moran. See Exhibit "J", p. 20; and See Exhibit "E".

118. Lois Moran does not supervise John Gourlay's work. See Exhibit "L", p. 187-188; and See Exhibit "R", second page.

119. John Gourlay, as Publisher, works on projects directly with the Executive Director, Carmine Branagan. See Exhibit "K", p. 114.

120. Donald Zanone did not work on any projects or write any reports directly to Carmine Branagan. See Exhibit "J", p. 24-26.

121. John Gourlay, as Publisher, is considered a member of the senior staff of ACC and attends senior staff meetings. See Exhibit "M", p. 127.

122. John Gourlay, as Publisher, is regularly asked to attend Board of Trustees Executive Committee meetings. See Affidavit of Carmine Branagan, paragraph 49.

123. Donald Zanone did not attend any Executive Committee meetings or prepare a report or memo to the Executive Committee. See Exhibit "J", p. 25-26.

124. John Gourlay, as Publisher, attends all Board of Trustees meetings. See Affidavit of Carmine Branagan, paragraph 48.

125. Mr. Zanone never attended a Board of Trustees meeting. See Exhibit "J", p. 24-25.

126. John Gourlay, as Publisher, makes presentations to the Board of Trustees. See Affidavit of Carmine Branagan, paragraph 50.

127. Mr. Zanone never made presentations to the Board of Trustees. See Exhibit "J", p. 25-6.

128. After April 2004, the Board of Trustees has a Publishing Committee and the Publisher, John Gourlay, is the staff liaison and facilitator to the Trustees Publishing Committee. See Affidavit of Carmine Branagan, paragraph 48.

129. Mr. Zanone did not serve as a liaison or facilitator to any Board of Trustees committee. See Exhibit "J", p. 25-26.

130. John Gourlay, as Publisher, has a private window office in a location that is on the opposite side of the area where plaintiff and Lois Moran had worked. See Exhibit "L", p. 189-190.

131. Donald Zanone's office was next to Lois Moran's office and he did not have a private office with a window. *Id.*; and See Exhibit "L", p. 54.

132. Plaintiff's office space remained vacant for over two years after his termination and an office temp was recently placed there. See Exhibit "L", p. 191.

133. ACC eliminated plaintiff's former position of Advertising Manager when it terminated the employment of plaintiff on April 28, 2004. See Affidavit of Carmine Branagan, paragraphs 23, 39, 40, & 42.

134. No ACC employee has held the position of Advertising Manager since plaintiff's termination. *Id.*

135. Donald Zanone is **not** positive for Human Immuno-Deficiency Virus ("HIV"). See Exhibit "J", p. 55-72.

17

136. Donald Zanone has **never been** infected with HIV. See Exhibit "J", p. 55-72.

137. Donald Zanone has had three HIV tests done and all three came back negative. See Exhibit "C", HIV antibody test results.

138. Mr. Zanone tested himself for HIV antibodies in February 2003, March 2000, and January 1999. *Id.* All three test results were negative for HIV antibodies. *Id.*

139. During the time that Donald Zanone claims to have believed that he was infected with HIV (from 2002 until April 2006), he never saw a single test result confirming that he was infected with HIV. See Exhibit "J", p. 57.

140. During the time that Donald Zanone claims to have believed that he was infected with HIV (from 2002 until April 2006), he did not take a test to confirm that he was HIV positive. See Exhibit "J", p. 57.

141. During the time that Donald Zanone claims to have believed that he was infected with HIV (from 2002 until April 2006), he did not take any medications for his alleged HIV infection. See Exhibit "J", p. 57.

142. During the time that Donald Zanone claims to have believed that he was infected with HIV (from 2002 until April 2006), he was examined by various doctors but he never informed any of these doctors that he was HIV positive. See Exhibit "J", p. 57-59.

143. During the time that Donald Zanone claims to have believed that he was infected with HIV (from 2002 until April 2006), he had a dental cleaning and he did not tell the dental hygienist that he was infected with HIV. *Id.* at p. 128-129.

144. When Donald Zanone went to the emergency room at Saint Vincent's Hospital in January 2004, he did not inform any of the doctors there that he was infected with HIV. See Exhibit "J", p. 58-59; and See Exhibit "C", email.

145. During the time that Donald Zanone claims to have believed that he was infected with HIV (from 2002 until April 2006), he did not seek any medical treatment for HIV infection. See Exhibit "J", p. 57.

146. During the time that Donald Zanone claims to have believed that he was infected with HIV (from 2002 until April 2006), he did not receive any medical treatment for HIV infection. See Exhibit "J", p. 57.

147. At 11:49pm, on Friday, January 16, 2004, Donald Zanone sent an email to only Lois Moran advising her for the first time that he had an HIV doctor. See Exhibit "C"; See Exhibit "J", p. 73-75; See Exhibit "A", paragraph 7; and See Exhibit "L", p. 124.

148. Lois Moran did not know of Donald Zanone's HIV status before receiving this email. See Exhibit "L", p. 124.

149. Lois Moran received this email sometime in the evening on Saturday, January 17, 2004, and wrote back to plaintiff at 6:54pm on Saturday, January 17, 2004. See Exhibit "C"; and See Exhibit "L", p. 124.

150. Monday, January 19, 2004 was Martin Luther King Day and ACC's offices were closed. See Exhibit "J", p. 76-78.

151. Sometime after January 18, 2004, Lois Moran verbally informed Carmine Branagan in a single brief conversation that she had received an email from Donald Zanone stating that he was HIV positive. See Exhibit "L", p. 124-129; and See Exhibit "K", p. 70-71 & p. 134-137.

152. Sometime after January 18, 2004, Lois Moran verbally informed Michael McKay in a single conversation that she had received an email from Donald Zanone stating that he was HIV positive. See Exhibit "M", p. 39-41; and See Exhibit "L", p. 124-129.

19

153. Lois Moran never had another communication with Carmine Branagan or Michael McKay about plaintiff's HIV status. See Exhibit "L", p. 124-129.

154. Lois Moran did not show Carmine Branagan or Michael McKay the email she received from plaintiff about his HIV status. See Exhibit "K", p. 74; See Exhibit "M", p. 40-41; See Exhibit "L", p. 125.

155. Lois Moran did not inform anyone else at ACC about Mr. Zanone's HIV status. See Exhibit "L", p. 129.

156. Aside from Lois Moran, no one else ever informed Carmine Branagan that Donald Zanone was HIV positive. See Exhibit "K", p. 71.

157. Carmine Branagan never had a communication with anyone about Donald Zanone's HIV status aside from the one conversation she had with Lois Moran. *Id.*; and See Affidavit of Carmine Branagan, paragraph 56.

158. Mr. Zanone does not remember having any further communications with Lois Moran about his HIV status aside from the January 16 and 17th, 2004 email exchange. See Exhibit "J", p. 80-82.

159. Mr. Zanone never had any communications with Carmine Branagan, Michael McKay or any other ACC employee about his alleged HIV status. See Exhibit "J", p. 80-82 and p. 73.

160. Mr. Zanone was always able to perform all his job functions without accommodation. See Exhibit "J", p. 106.

161. Mr. Zanone never asked for any accommodations to his working conditions. See Exhibit "J", p. 105-106.

162. From the date when ACC learned of plaintiff's alleged HIV condition until plaintiff's termination on April 28, 2004, ACC did not negatively change any aspect of Mr. Zanone's working conditions. See Exhibit "J", p. 105-106.

163. After learning of plaintiff's HIV status, Carmine Branagan did not give any instructions or advice to Lois Moran on how to respond to plaintiff's disclosure. See Exhibit "L", p. 126-7.

164. Donald Zanone never heard any oral statements from Carmine Branagan regarding his age or alleged disability. See Exhibit "J", p. 24-25.

165. Donald Zanone never received any written communications from Carmine Branagan regarding his age or alleged disability. See Exhibit "J", p. 24-25.

166. ACC never wrote any document to plaintiff that he believed was discrimination. See Exhibit "J", p. 106-107.

167. Plaintiff cannot recall any oral statement by an ACC employee that he believed was discrimination against him. See Exhibit "J", p. 107.

168. Mr. Zanone's age and alleged disability were never considered by Carmine Branagan in the decision to terminate his employment. See Affidavit of Carmine Branagan, paragraphs 54 & 55.

169. On or about June 23, 2004, plaintiff filed an administrative Charge of Discrimination with the Equal Employment Opportunity Commission alleging age and disability discrimination. See Exhibit "B".

170. On or about March 8, 2005, the Equal Employment Opportunity Commission issued a Dismissal and Notice of Rights. See Exhibit "B".

171. On or about June 1, 2005, plaintiff filed a Federal Court Complaint in the Southern District of New York alleging discrimination based on age and disability. See Exhibit "I".

172. Judge Loretta Preska was assigned to plaintiff's Federal Court Complaint. *Id.*

173. After learning that Judge Loretta Preska was assigned to his case, plaintiff served and filed a Notice of Dismissal of his Federal Court Complaint the very next day. *Id.*

174. On June 2, 2005, plaintiff filed a New York State Supreme Court Complaint identical to the Federal Court Complaint alleging discrimination based on age and disability. Compare the Complaints from Exhibit "A" and Exhibit "I".

175. On August 2, 2005, defendant removed the Supreme Court case to Federal Court and was assigned to Your Honor. See Exhibit "A".

176. Plaintiff did not provide defendant with a copy of the prior Federal Court Complaint assigned to Judge Preska until September 15, 2006. See Exhibit "I".

177. Defendant served an Answer to the Complaint. See Exhibit "A".

178. Discovery is complete.

179. No issue of material fact exists to preclude summary judgment.

DATED:   December 1, 2006
         New York, New York

                Yours, etc.,
                HOEY, KING, TOKER & EPSTEIN
                Attorneys for Defendant
                AMERICAN CRAFT COUNCIL
                Office and Post Office Address
                55 Water Street, 28th Floor
                New York, New York 10041
                (212) 612-4200

By: _____
                **Glen H. Parker** (GP 3534)